UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
ALEXIS FROIO,

                                Plaintiff,         **OPINION & ORDER**

   - against -                                   No. 17-CV-604 (CS)

MONROE-WOODBURY CENTRAL SCHOOL
DISTRICT,

                                Defendant.
------------------------------------------------------------x

Appearances:

James E. Monroe
Dupee & Monroe, P.C.
Goshen, New York
*Counsel for Plaintiff*

Adam I. Kleinberg
Brittany A. Tarazona
Sokoloff Stern LLP
Carle Place, New York
*Counsel for Defendant*

Seibel, J.

      Before the Court is the summary judgment motion of Defendant Monroe-Woodbury Central School District (the "District"). (Doc. 93.) For the following reasons, the District's motion is GRANTED.

**I.    BACKGROUND**

    **A.    Facts**

      The following facts are based on the parties' Local Civil Rule 56.1 statements, responses, and supporting materials, and are undisputed except as noted.

Plaintiff Alexis Froio is a former District student who attended Monroe-Woodbury Central High School ("MWCHS") from ninth through twelfth grade. (Doc. 98 ("P's 56.1 Resp.") ¶¶ 20-21.) She suffers from behavioral and learning disabilities – she has been diagnosed with fragile X syndrome and attention deficit hyperactivity disorder – and consequently received support and instruction in school pursuant to an individualized education plan ("IEP"). (*See* Doc. 94 ("Kleinberg Decl.") Ex. C ("Alexis Froio Dep.") at 323:11-16, 327:23-328:13; *id.* Ex. E ("Gina Froio Dep.") at 32:20-33:17, 101:17-19; *id.* Exs. G-N (IEPs from May 4, 2015, to January 20, 2017).)

In September 2015, Plaintiff was assigned to Holly Martucci's eleventh-grade English class. (P's 56.1 Resp. ¶ 22; *see id.* ¶ 2.) While enrolled in Martucci's class, Plaintiff began engaging in behavior that Martucci said made her feel uncomfortable. Plaintiff emailed Martucci several times in a tone that Martucci felt was inappropriate for student-teacher emails. (*Id.* ¶¶ 24-25; Kleinberg Decl. Ex. D ("Martucci Aff.") ¶ 4.)[1] For example, Martucci affirms that in these emails, Plaintiff "referred to herself as 'princess,' included photos of herself as an attachment, used hashtags and emojis, made demands such as 'tell me ASAP,' and included too much praise of [Martucci]." (Martucci Aff. ¶ 5.) Additionally, Plaintiff commented on family vacation photos posted online by Martucci's son, who also attended MWCHS. (*Id.* ¶ 6; P's 56.1

---

[1] I do not accept the truth of Martucci's affidavit because she is an interested witness that the jury is not required to believe. *See, e.g.*, *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000) (on motion for summary judgment, district court "must disregard all evidence favorable to the moving party that the jury is not required to believe"); *Davis-Garett v. Urban Outfitters, Inc.*, 921 F.3d 30, 46 (2d Cir. 2019) (same); *Williams v. City of White Plains*, 718 F. Supp. 2d 374, 377 (S.D.N.Y. 2010) (evidence that court should disregard on summary judgment "includes testimony and affidavits from interested witnesses"). In other words, I do not accept Martucci's conclusion that Plaintiff's behavior – most of which Plaintiff concedes occurred – was inappropriate, but Martucci's view that it was inappropriate is relevant because she conveyed that view to the District and eventually the police.

2

Resp. ¶ 57; Alexis Froio Dep. at 230:17-231:24 ("I commented on her son's picture because we were friends on Instagram.  And, like, I think there was just a picture of her and him on, like, vacation or something.  And, like, as a joke I think put, oh, my gosh.  I called her, like, Holly at the time, for some reason.  I was like, oh, my God, it's Holly, she's the best.").)  Plaintiff also posted the following review of Martucci on a teacher-rating website:

> Ughh I love Mrs.[ ]Martucci she is literally an angel.  Whenever I'm stressed about something test,[ ]paper, or anything else she is always so accomidating [*sic*], thoughtful, and loving.  We have such a great relationship I see her all the time and I love it she's like my sunshine.  I love her sense of style she always looks so beautiful!  Such an elegant,[ ]intelligent woman.  Enjoy talking [to] her and spending time with her she is always calming her voice is so soothing it used to make me go to sleep.  LOVE YOU HOLLY!

(Martucci Aff. Ex. 1; *see* P's 56.1 Resp. ¶¶ 27-28.)

On November 16, 2015, Plaintiff stopped outside Martucci's house while on a run and lingered for approximately five minutes before leaving.  (P's 56.1 Resp. ¶ 29; Alexis Froio Dep. at 58:19-64:12.)  The next day, Plaintiff told Martucci that she had stopped by Martucci's house.  (P's 56.1 Resp. ¶ 30.)  Thereafter, Martucci told the school's principal that she felt uncomfortable with Plaintiff's conduct and communication.  (*Id.* ¶ 32.)

With her mother's consent, Plaintiff was reassigned to the same English class but with a different teacher.  (*Id.* ¶¶ 33-36.)  On November 18, Plaintiff, Martucci, and the District's social worker met in the principal's office, where the principal explained to Plaintiff that "she was not in trouble but had been removed from Martucci's class because she made Martucci uncomfortable."  (*Id.* ¶¶ 37-38 (citation omitted).)  The principal directed Plaintiff "to stay away from Martucci," and he told her "not to talk to or email Martucci anymore."  (*Id.* ¶ 39.)  The social worker and Martucci also told Plaintiff to stop speaking to Martucci, and Martucci informed Plaintiff that her conduct and communications made Martucci uncomfortable.  (*Id.* ¶¶ 40-41.)  Based on this meeting, Plaintiff "knew not to email or talk to Martucci."  (*Id.* ¶ 42.)

3

But Plaintiff did not stop communicating with Martucci and continued to send Martucci emails that made her uncomfortable. (*Id.* ¶¶ 43-44, 46.) Plaintiff sent two emails to Martucci shortly after the November 18 meeting, (*id.* ¶ 47), which contained nearly identical apologies to Martucci, (*see* Martucci Aff. Ex. 2). Plaintiff sent Martucci another email on December 1, (P's 56.1 Resp. ¶ 48), in which she expressed dissatisfaction with her new English teacher, apologized to Martucci again, and described how sad she was about the events that had transpired, (*see* Martucci Aff. Ex. 3). Plaintiff also began stopping by Martucci's classroom "to cry next to it." (Alexis Froio Dep. at 55:18-22.) According to Plaintiff, she did this "often" or "[q]uite a lot" – even after being told by her parents to stop – and Plaintiff testified that Martucci saw her do this at least twenty times. (*Id.* at 55:23-58:9; *see* P's 56.1 Resp. ¶¶ 53-54.) Additionally, Plaintiff "made social media postings about Martucci's son and his friends," calling him "a piece of shit or something similar" on one occasion and saying that she hated him on another. (P's 56.1 Resp. ¶¶ 50-52 (internal quotation marks omitted).)

On December 10, 2015, Martucci contacted the Town of Woodbury Police Department and filed a report about Plaintiff's conduct. (*Id.* ¶ 65.) Meanwhile, Plaintiff continued to contact Martucci. (*Id.* ¶ 68.) The parties dispute the exact nature of the continued contact with Martucci and her family around this time. Plaintiff admits that she sent emails to Martucci that made her uncomfortable, walked or stopped by Martucci's classroom and cried, and told Martucci that her hair looked nice one day. (*Id.* ¶¶ 46, 53-54, 56.) But Plaintiff denies that she tried to contact Martucci's children and their friends, and she also denies that she followed Martucci and her son around school. (*Id.* ¶¶ 45, 59-63, 69-72.)

On January 6, 2016, Plaintiff sent Martucci an email in which she wrote, among other things, that the "whole situation" was "literally driving [her] insane" and "tearing [her] apart no

4

matter how hard [she] tr[ied] to move forward from it" and that she was "hella mad."  (Martucci Aff. Ex. 4.)  Plaintiff also suggested that it would make her happy if she could be in Martucci's class again.  (*See id.*)  That same day, Martucci's husband contacted the police to follow up on Martucci's December report.  (P's 56.1 Resp. ¶ 74.)

One week later, the school's principal called Plaintiff into his office, informed Plaintiff that the police were involved, and again told Plaintiff that she must stop contacting Martucci. (*Id.* ¶¶ 77-78.)  The parties dispute several instances of contact between Plaintiff and Martucci afterward, (*see id.* ¶¶ 79-82), but it is undisputed that Martucci met with the Town of Woodbury police on February 12 to discuss Plaintiff's "unwanted communication and what Martucci believed to be harassment of her and her children," (*id.* ¶ 83).

On February 23, Plaintiff sent Martucci another email.  (*Id.* ¶ 85.)  By this time, Plaintiff had sent Martucci over twenty emails since she had been removed from her class in November. (*Id.* ¶ 86.)  In the email, Plaintiff described her distress upon hearing that Martucci had called the police, stated that she didn't "know how much more a person can take," and wrote that she was doing "things [she] would NEVER normally do," such as running away from home, fighting with her parents, taking her mother's credit card, and hurting herself, "like cutting on [her] arms and [her] stomach."  (Martucci Aff. Ex. 5.)  Plaintiff also described how lonely she was without Martucci in her life and again suggested that she switch back into Martucci's class.  (*See id.*)

Martucci opened the email the following morning and forwarded it to the school's principal and other District administrators.  (P's 56.1 Resp. ¶ 89.)  Because of the email's reference to Plaintiff hurting herself, police and EMTs were summoned to the school.  (Alexis Froio Dep. at 66:8-67:4, 93:11-94:8.)  The police told Plaintiff to stop contacting Martucci, and Plaintiff was transported to a hospital for examination.  (*Id.* at 93:11-94:5, 261:14-264:17.)

5

Martucci followed up with the police about the email and on or about February 25, sought a temporary order of protection from Plaintiff.  (P's 56.1 Resp. ¶¶ 90-91.)

Plaintiff sent Martucci and her principal two more emails on March 1 and 2, one of which contained middle-finger emojis in the subject line.  (Martucci Aff. Exs. 6-7; *see* P's 56.1 Resp. ¶¶ 93-94.)  The emails described how Plaintiff was at her "wits [*sic*] end" and "infuriated with how 11th grade has been going," and she accused her principal of holding "secret meetings" about Plaintiff and being on Martucci's "side."  (Martucci Aff. Exs. 6-7.)  Plaintiff also demanded a "sit down" with Martucci and complained about being switched out of her English class.  (*Id.*)  She added, "You think we need to go to war?  [W]ell you're already in one! :) because it's people like you who need to get sued.  No one wants your opinion[.]  It's time we figure something out to make (ME) happy and ease some of this tension."  (*Id.* Ex. 6.)  Martucci forwarded Plaintiff's March 2 email to the police and filed a supporting deposition with the police about Plaintiff's unwanted contact.  (P's 56.1 Resp. ¶ 97.)  On March 4, a complaint was filed against Plaintiff for harassment in the second degree in violation of N.Y. Penal Law § 240.26(3).  (Doc. 30 ("SAC") Ex. E.)

On March 6, Plaintiff "showed up at Martucci's neighbor's house appearing disheveled and crying and the Town of Monroe police department took a report."  (P's 56.1 Resp. ¶ 98.)  A few days later, Plaintiff saw Martucci at school and yelled "'I can be here'" at her.  (*Id.* ¶ 99.)  Later in March, Martucci observed Plaintiff in the stairwell next to Martucci's classroom.  (*Id.* ¶ 100.)

On April 3, Plaintiff sent Martucci two more emails, one of which was nearly identical to Plaintiff's November emails and one of which was a similar, truncated version of her February 23 email.  (*Id.* ¶¶ 102-103.  *Compare* Martucci Aff. Ex. 2, *with id.* Ex. 10; *compare id.* Ex. 5,

6

*with id.* Ex. 9.)  By this time, Plaintiff's parents, her principal, and the District's social worker had each told Plaintiff thirty or forty times to stop contacting Martucci.  (P's 56.1 Resp. ¶ 105.)  Additionally, the police had told Plaintiff at least five times to stop contacting Martucci.  (*Id.* ¶ 106.)  Further, Plaintiff knew that she was not supposed to send Martucci emails, (*id.* ¶ 95), and she "knew her emails were making Martucci uncomfortable, but she persisted because Martucci had upset her," (*id.* ¶ 107).

Two days later, on April 5, an order of protection was entered against Plaintiff.  (*Id.* ¶ 108.)  The order provided that Plaintiff had to stay at least 1000 feet away from Martucci at all times other than in school, where she had to stay at least 50 feet away, and it prohibited Plaintiff from contacting Martucci by mail, telephone, email, or any other means.  (*Id.* ¶¶ 110-111; Martucci Aff. Ex. 11.)  Plaintiff signed the order of protection and understood its requirements.  (P's 56.1 Resp. ¶ 109.)

Plaintiff did not, however, refrain from contacting Martucci and did not stay at least fifty feet away from Martucci while at school.  (*Id.* ¶¶ 112-113.)  On April 20 or 21, Plaintiff came within fifteen to thirty feet of Martucci and screamed, "I hate school."  (*Id.* ¶¶ 114-115.)  And on or about April 22, Plaintiff came within fifty feet of Martucci at an athletic event.  (*Id.* ¶ 117.)[2]  Plaintiff's and Martucci's accounts of the incident differ slightly, but both involve Plaintiff sitting or lying down on the ground while crying approximately fifteen feet away from Martucci because Plaintiff "wanted Martucci to see how much pain Martucci was causing."  (*See id.*

---

[2] The parties' Local Rule 56.1 statements and responses state that this occurred on April 22, (*see* Doc. 96 ¶ 117; P's 56.1 Resp. ¶ 117), and Plaintiff testified that this event occurred on that date, (Alexis Froio Dep. at 184:8-17), but Martucci affirmed that this event occurred on or about April 20, (Martucci Aff. ¶ 68), and the complaint filed against Plaintiff following this incident is dated April 20, (SAC Ex. H).  The exact date of the incident is immaterial for the purposes of this motion.

¶¶ 121-124, 126-127.) Martucci contacted the police about the incident, gave a statement, and filed a supporting deposition. (*Id.* ¶¶ 131, 134.) At the request of the police, Plaintiff's parents brought her to the police station, where Plaintiff was arrested for violating the order of protection. (*Id.* ¶¶ 135-137.) Plaintiff appeared on May 3 for a hearing regarding her violation of the order of protection, where she was told once again to stop contacting Martucci. (*Id.* ¶¶ 138-140.)

Two days later, Plaintiff sent another email to Martucci in which Plaintiff described how "fucking miserable" she was and blamed Martucci for "trying to ruin [her] life." (Martucci Aff. Ex. 13.) The next day, Martucci forwarded the email to the school's principal and the police. (P's 56.1 Resp. ¶ 146.) The police came to MWCHS, where Martucci gave a statement and filed a supporting deposition. (*Id.* ¶¶ 148-149.) Then, Plaintiff's mother arrived and Plaintiff was taken to the police station, where Plaintiff was arrested for violating the order of protection. (*Id.* ¶¶ 151-153; *see* SAC Ex. J.) Plaintiff attended a court hearing on June 7 and was told that she would go to jail if she continued contacting Martucci, after which Plaintiff had no further contact with Martucci. (P's 56.1 Resp. ¶¶ 155-156.)

Throughout all of this, no one from the District ever told Martucci (or her husband) to contact the police or seek an order of protection. (*Id.* ¶¶ 66, 75, 84, 92, 132, 147.) The District's Committee on Special Education ("CSE") also met regularly to discuss Plaintiff's IEP. (*Id.* ¶¶ 160-163, 173-174.) The CSE recommended – and Plaintiff received – special-education programs and services, including a resource room, a special math class, special curriculum support, twice-weekly counseling, refocusing and redirection, copies of class notes, assistance in attending classroom activities, checks for understanding from teachers, an extra set of textbooks

8

for home, a one-to-one monitor, and home instruction. (*Id.* ¶¶ 164, 176, 178.)[3] Plaintiff "does not believe there were any programs or services the District should have offered her in the IEP that she did not receive." (*Id.* ¶ 177.) The CSE also recommended other services that Plaintiff's mother declined, including a psychiatric evaluation at the District's expense and a smaller educational setting with increased therapeutic support. (*Id.* ¶¶ 166-170.) Plaintiff timely completed eleventh and twelfth grade and graduated with a Regents diploma on her expected graduation date. (*Id.* ¶¶ 186, 188.)

### B. Procedural History

Plaintiff filed this lawsuit on January 26, 2017, against two police officers who participated in her arrests (Kristen Potter and Joseph Iorio), the Monroe-Woodbury Central School District, and Holly Martucci, alleging violations of Title II of the Americans with Disabilities Act ("ADA"), Section 504 of the Rehabilitation Act of 1973 ("Section 504"), and the Individuals with Disabilities Education Act ("IDEA"), as well as civil rights violations in the form of false arrest and malicious prosecution. (Doc. 1 ("Compl.").)[4] Plaintiff initially sought compensatory and punitive damages, costs and attorneys' fees, and injunctive relief, (*id.* at 18), but she has since abandoned her claim for injunctive relief, conceding that it is moot because Plaintiff has graduated and is no longer a student in the District, (Doc. 97 ("P's Opp.") at 11 n.3).

---

[3] Plaintiff contends that she "did not receive the type of counseling, refocusing and redirection which would [have] assisted her with her emotional disabilities," but does not specify what alternative type would have sufficed or cite any evidence to support this proposition. (P's 56.1 Resp. ¶ 165.)

[4] This lawsuit was initially brought by Plaintiff's mother, Gina Froio, on her daughter's behalf using only their initials. (*See* Compl.) As Plaintiff had already reached the age of majority at the time of filing, Plaintiff's mother was dropped as a party, (*see* SAC), and the caption was later amended to reflect Plaintiff's full name, (*see* Doc. 69).

Defendants filed pre-motion letters in anticipation of motions to dismiss. (Docs. 15, 17, 19.) In response, Plaintiff filed an Amended Complaint. (Docs. 24-25.)[5] The Court held a pre-motion conference to discuss the proposed motions. (Minute Entry dated Apr. 7, 2017.) Afterward, Plaintiff filed a Second Amended Complaint in which she dropped her false arrest and malicious prosecution claims against the District. (*See* SAC.) Defendants responded by filing motions to dismiss the SAC. (Docs. 38, 41, 47.)

On June 26, 2018, the Court ruled on Defendants' motions to dismiss, granting the motions as to the police officers and Martucci and entering judgment in their favor, but denying the District's motion, which sought to dismiss the claims against the District for failure to exhaust administrative remedies. (*See* Minute Entry dated June 26, 2018; Doc. 55; Kleinberg Decl. Ex. B.) In her opposition to Defendants' motions to dismiss, Plaintiff expressly abandoned her IDEA claim against the District. (*See* Doc. 45 at 1; Kleinberg Decl. Ex. B at 9.) Consequently, the only claims remaining in this case are Plaintiff's ADA and Section 504 claims against the District. (*E.g.*, P's 56.1 Resp. ¶ 19; *see* SAC at 15-20.)

Shortly after the close of fact discovery, the District filed a pre-motion letter in anticipation of its motion for summary judgment. (Doc. 74.) Plaintiff filed a response letter, (Doc. 75), the Court held a pre-motion conference, (Minute Entry dated Mar. 18, 2019), and the instant motion followed.

---

[5] Plaintiff filed an Amended Complaint on April 6, 2017, (Doc. 24), and refiled it on April 7, 2017, (Doc. 25). It is not clear whether or how the two documents differ.

## II. LEGAL STANDARD

### A. Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law . . . . Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* On a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence sufficient to satisfy every element of the claim." *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (internal quotation marks omitted).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . .

admissions, interrogatory answers, or other materials . . . ." Fed. R. Civ. P. 56(c)(1). Where an affidavit or declaration is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008). In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it." Fed. R. Civ. P. 56(e).

**B.    The ADA and Section 504**

"The ADA and Section 504 both protect 'qualified individual[s] with a disability.'" *B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 158 (2d Cir. 2016) (alteration in original) (quoting 42 U.S.C. § 12132 (ADA) and 29 U.S.C. § 794(a) (Section 504)). Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Similarly, Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). "Apart from the Rehabilitation Act's limitation to denials of benefits 'solely' by reason of disability and its reach of only federally funded – as opposed to 'public' – entities, the reach and requirements of both statutes are precisely the same." *Weixel v. Bd. of Educ.*, 287 F.3d 138, 146 n.6 (2d Cir. 2002). "Because

12

the standards adopted by the two statutes are nearly identical," courts in this circuit "consider the merits of these claims together." *B.C.*, 837 F.3d at 158 (internal quotation marks omitted); *see Rodriguez v. City of N.Y.*, 197 F.3d 611, 618 (2d Cir. 1999) (assessing ADA and Section 504 claims together).

A plaintiff asserting a discrimination claim under the ADA or Section 504 must show the following:  "(1) plaintiff is a qualified individual with a disability; (2) plaintiff was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by the public entity; and (3) such exclusion or discrimination was due to plaintiff's disability." *B.C.*, 837 F.3d at 158 (internal quotation marks and alterations omitted). Here, there is no dispute that Plaintiff is a qualified individual with a disability or that the District is a public entity subject to the ADA and Section 504.

In the special-education context, an ADA or Section 504 claim "may be predicated on the claim that a disabled student was denied access to a free appropriate education, as compared to the free appropriate education non-disabled students receive." *C.L. v. Scarsdale Union Free Sch. Dist.*, 744 F.3d 826, 841 (2d Cir. 2014) (internal quotation marks omitted).  "Such a claim, however, requires proof of bad faith or gross misjudgment." *Id.*; *see R.B. ex rel. L.B. v. Bd. of Educ.*, 99 F. Supp. 2d 411, 419 (S.D.N.Y. 2000) (Under the ADA or Section 504, "a plaintiff must demonstrate more than an incorrect evaluation or substantively faulty IEP to establish liability; a plaintiff must show that defendants acted with bad faith or gross misjudgment.").  To recover monetary damages under the ADA or Section 504, a plaintiff must also show "intentional conduct." *Booker v. City of N.Y.*, No. 17-CV-7035, 2018 WL 4616048, at *5 (S.D.N.Y. Sept. 26, 2018); *see Loeffler v. Staten Island Univ. Hosp.*, 582 F.3d 268, 275 (2d Cir. 2009) ("[M]onetary damages are recoverable only upon a showing of an *intentional* violation.")

(emphasis in original).  This can demonstrated through "deliberate indifference to the strong likelihood of a violation," *Loeffler*, 582 F.3d at 275 (internal quotation marks and alteration omitted), which occurs where "an official with authority to address the alleged discrimination and to institute corrective measures on Plaintiff's behalf had actual knowledge of ongoing discrimination against Plaintiff but failed to respond adequately," *Gershanow v. County of Rockland*, No. 11-CV-8174, 2014 WL 1099821, at *4 (S.D.N.Y. Mar. 20, 2014) (internal quotation marks omitted).

## III.   DISCUSSION

The District argues that it is entitled to summary judgment on two grounds:  First, it contends that Plaintiff has not shown that Martucci's actions were due to Plaintiff's disabilities. (Doc. 95 ("D's Mem.") at 9-12.)  Second, it argues that Plaintiff has not presented evidence that the District intentionally discriminated against Plaintiff due to her disabilities, that the District was deliberately indifferent to a violation of the ADA or Section 504, or that the District acted with bad faith or gross misjudgment in the administration of disability services.  (*Id.* at 5-8, 13-14.)

### A.   Whether Martucci's Actions Were Due to Plaintiff's Disabilities

Plaintiff alleges that she was "excluded from adequate free appropriate public education due to her known intellectual, emotional and/or behavioral disabilities and has otherwise been denied the right to fully participate and receive the benefits of a public education due to the repeated arrests initiated or orchestrated by . . . Martucci."  (SAC ¶ 77.)[6]  The District, however,

---

[6] In her opposition memorandum, Plaintiff mentions in passing that her ADA and Section 504 claims are also based on Martucci's "retaliation in response to plaintiff's known emotional and intellectual disabilities" and includes the elements of a retaliation claim, (P's Opp. at 8-9), but Plaintiff does not describe in what protected activity she allegedly engaged, *see Clark v.*

14

correctly notes that Plaintiff has not produced any evidence that Martucci's actions were due to Plaintiff's disabilities. (D's Mem. at 9-12.) Instead, the undisputed facts demonstrate that Martucci's actions were due to Plaintiff's unwanted contact, which persisted even after an order of protection was entered against Plaintiff.

Plaintiff attempts to show discrimination through the following syllogism: Plaintiff's repeated unwelcome communications were due to Plaintiff's disabilities; Martucci's actions were due to Plaintiff's repeated unwelcome communications; therefore, Martucci's actions were due to Plaintiff's disabilities. (P's Opp. at 10.) But syllogism breaks down quickly for multiple reasons. First, Plaintiff has not presented evidence or a basis for inferring that her repeated unwelcome communications were due to her disabilities. The portions of the record that Plaintiff

---

*Jewish Childcare Ass'n*, 96 F. Supp. 3d 237, 261 (S.D.N.Y. 2015) ("A plaintiff engages in a 'protected activity' under the ADA if she 'has opposed any act or practice made unlawful by this chapter' or has 'made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.'") (emphases omitted) (quoting 42 U.S.C. § 12203(a)), or explain how these elements are satisfied. This type of undeveloped argument is unacceptable where a plaintiff is represented by counsel. I would be on firm ground were I to find this cause of action abandoned based solely on the failure to adequately brief the issue. *See, e.g.*, *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived . . . ."). I decline to consider it for the additional reason that Plaintiff did not allege a retaliation claim against the District in her SAC, and "it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment." *Wilson v. City of N.Y.*, 480 F. App'x 592, 594 (2d Cir. 2012) (summary order) (internal quotation marks omitted); *see also Greenidge v. Allstate Ins. Co.*, 446 F.3d 356, 361 (2d Cir. 2006).

Similarly, I decline to consider Plaintiff's argument that the District "failed to accommodate" her, (P's Opp. at 5), because Plaintiff did not allege a failure-to-accommodate claim in her SAC, (*see* Kleinberg Decl. Ex. B at 20:5-9 (noting that Plaintiff's SAC does not include a failure-to-accommodate claim)). Further, even in her brief, Plaintiff does not describe a reasonable accommodation to which she was entitled but which she did not receive. *See Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 73 (2d Cir. 2019) (affirming grant of summary judgment for defendant where plaintiff did not "identif[y] a reasonable accommodation that [defendant] refused to provide").

cites for this notion, (*see* P's Opp. at 2-4), support the propositions that Plaintiff was told to stop contacting Martucci, (*see* Alexis Froio Dep. at 65-66, 93, 105-07, 171-74, 211-12), that Plaintiff continued to contact Martucci, (*see id.* at 55, 107-08; Martucci Aff. ¶¶ 14, 26, 31-32, 43-49; *id.* Exs. 1-7, 9-10, 13), and that Plaintiff had been diagnosed with fragile x syndrome and had an IEP, (*see* Gina Froio Dep. at 101-06; Martucci Aff. Exs. G-J),[7] but do not mention whether Plaintiff's disabilities caused her to continue to contact Martucci after being told countless times to desist and despite knowing that it made Martucci uncomfortable.  Second, Plaintiff does not address the fact that she was able to stop contacting Martucci once she was told that she would go to jail if she continued.

But assuming that Plaintiff's repeated unwelcome communications were due to Plaintiff's disabilities, Second Circuit precedent "clearly forecloses plaintiff's argument that since her disability caused her conduct, she was in essence [discriminated against] because of her disability." *Pearson v. Unification Theological Seminary*, 785 F. Supp. 2d 141, 164 (S.D.N.Y. 2011).  This is because the ADA does not require public entities to "countenance dangerous misconduct, even if that misconduct is the result of a disability." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 172 (2d Cir. 2006) (affirming summary judgment on ADA claims because plaintiff could "point to no evidence from which a reasonable jury could conclude that he was terminated on account of his mental illness rather than his past behavior").  In the education context, "the ADA and the Rehabilitation Act permit [a school] to discipline a student even if the student's misconduct is the result of disability." *Tylicki v. St. Onge*, 297 F. App'x 65, 67 (2d Cir. 2008) (summary order) (holding that suspension from school does not constitute denial of access to programs under ADA or Rehabilitation Act).  Absent evidence that Martucci would not have

---

[7] Plaintiff also cites "Ex. O," which is not in the record.  (*See* P's Opp. at 3.)

16

taken the same actions if a non-disabled student engaged in the same conduct – which Plaintiff has not produced – Martucci's actions cannot be said to be due to Plaintiff's disabilities. *Cf. Pearson*, 785 F. Supp. 2d at 163-64 ("[A]n employer 'may discipline or terminate an individual who, because of disability, makes a threat against other employees if the same discipline would be imposed on a non-disabled employee engaged in the same conduct.'") (quoting *Sista*, 445 F.3d at 171).[8]

Plaintiff also contends that Martucci's "unwillingness to abide by the mandates of plaintiff's IEP by having her arrested on three separate occasions evidences [her] discriminatory motives," (P's Opp. at 10), separately noting that "[n]owhere within [Plaintiff's] IEP . . . does it authorize the use of law enforcement to achieve plaintiff's educational or behavioral goals," nor does it "bestow any special powers to Martucci as a public school teacher to punish [Plaintiff] for behaviors that her disabilities deprive her from controlling," (*id.* at 4). This argument is unconvincing for several reasons. First, Plaintiff does not cite any provision of Plaintiff's IEP that Martucci should have "abide[d] by" instead of contacting the police about Plaintiff's conduct, and a review of Plaintiff's IEPs, (Kleinberg Decl. Exs. G-N), reveals none. Second, Plaintiff cites no evidence that Martucci's actions were a "punishment" designed to achieve educational or behavioral goals. Third, Plaintiff provides no support for the proposition that a teacher cannot contact the police to report illegal conduct without authorization from an IEP. And fourth, Plaintiff provides no explanation why Martucci, who was not Plaintiff's teacher when she contacted the police, would be required to follow Plaintiff's IEP even if it did mandate alternative procedures for addressing Plaintiff's unwanted contact.

---

[8] Behavior can be frightening even if it originates from a disability. While there might be teachers who would have tolerated Plaintiff's stalking-like conduct for longer, no reasonable jury could conclude that a teacher is required to endure such behavior.

17

Ultimately, Plaintiff's assertions that Martucci "deliberately targeted [Plaintiff] due to her disability," (P's Opp. at 8), amount to "conclusory allegations" and "unsubstantiated speculation," *Fujitsu Ltd.*, 247 F.3d at 428 (internal quotation marks omitted).  Accordingly, the District is entitled to summary judgment on Plaintiff's ADA and Section 504 claims because no reasonable jury could find that Plaintiff was discriminated against due to her disabilities.

### B. Whether the District Intentionally Discriminated Against Plaintiff, Was Deliberately Indifferent to a Violation, or Acted with Bad Faith or Gross Misjudgment in the Administration of Disability Services

Plaintiff alleges that while on notice of Martucci's "discriminatory actions," the District allowed Martucci to "continue to engage in conduct alleged in this Complaint and acted intentionally, knowingly and with deliberate indifference to the plaintiff's federally protected rights."  (SAC ¶ 70.)  The District argues that Plaintiff has failed to produce evidence of the type of intentional conduct required to recover monetary damages for an ADA or Section 504 violation, such as deliberate indifference to the substantial likelihood of a violation, nor has Plaintiff produced evidence that the District acted with bad faith or gross misjudgment in the administration of disability services.  (D's Mem. at 5-8, 13-14.)  I agree.

There is no evidence of an intentional ADA or Section 504 violation here.  It is undisputed that no District administrator filed a police report, assisted Martucci in her reports, or told Martucci (or her husband) to contact the police or seek an order of protection.  (*See* P's 56.1 Resp. ¶¶ 66, 75, 84, 92, 132, 147.)  Further, as explained above, there is no evidence that Martucci's actions were due to Plaintiff's disabilities, which means that the District could not have "had actual knowledge of ongoing discrimination against Plaintiff but failed to respond adequately."  *Gershanow*, 2014 WL 1099821, at *4 (internal quotation marks omitted).  But even if the District had questioned Martucci's motives – a proposition for which there is no evidence – Plaintiff provides no authority for the notion that the District could have prevented Martucci

18

from contacting the police or seeking an order of protection, or that it could have ignored the order of protection once it was entered. If anything, the record shows that the District actively tried to defuse the situation: not only did District personnel attempt to separate Plaintiff and Martucci, and not only did they meet repeatedly with Plaintiff in an effort to solve the problem of Plaintiff's unwelcome contact with Martucci, (P's 56.1 Resp. ¶¶ 34, 39-40, 78, 96, 105), but Plaintiff testified that the school's principal and the District's superintendent also asked Martucci to stop contacting the police, (Alexis Froio Dep. at 97:3-98:12, 287:8-288:25, 403:7-404:2). There is simply no evidence from which a reasonable jury could conclude that the District failed to respond adequately or was otherwise deliberately indifferent to the substantial likelihood of an ADA or Section 504 violation.

There is also no evidence that the District acted with bad faith or gross misjudgment in the administration of disability services. Plaintiff claims that she "did not receive the type of counseling, refocusing and redirection which would [have] assisted her with her emotional disabilities" and helped her avoid "being disciplined by Martucci in the form of plaintiff's arrests," (P's 56.1 Resp. ¶¶ 165, 175), but she points to no evidence to substantiate this claim and also concedes that she sees "no material pedagogical or academic flaw(s) in [her] education," (P's Opp. at 5). Further, it is undisputed that Plaintiff received special-education programs and services that included twice-weekly counseling, refocusing and redirection, and a one-to-one monitor, (P's 56.1 Resp. ¶ 176), and Plaintiff testified that she "does not believe there were any programs or services the District should have offered her in the IEP that she did not receive," (*id.* ¶ 177). Overall, Plaintiff has not produced any evidence that the District acted with bad faith or gross misjudgment, and the District is entitled to summary judgment. *See C.L.*, 744 F.3d at 841

(affirming summary judgment for defendant where plaintiffs "failed to present sufficient evidence of bad faith or gross misjudgment to raise an issue for trial").

* * *

The Court understands why Plaintiff believes Martucci should have been more tolerant of Plaintiff's conduct. The Court also understands why Martucci felt threatened and that the police had to become involved. The Court further understands how the District was caught between a rock and a hard place. This clash has unfortunately resulted in bad feelings all around. But it is not one for which federal law provides Plaintiff with a remedy.

## IV. CONCLUSION

For the reasons set forth above, the District's motion for summary judgment is GRANTED. The Clerk of Court is respectfully directed to terminate the pending motion, (Doc. 93), enter judgment for Defendant Monroe-Woodbury Central School District, and close the case.

**SO ORDERED.**

Dated: May 26, 2020
      White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.